UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

                Plaintiff,

    vs.                           REPORT AND RECOMMENDATION

Dennis Eugene Mentzos,
a/k/a Christian Mendoza,
a/k/a Dennis Foster,

                Defendant.        Crim. No. 04-173 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Pretrial Motions of the Defendant:

1.    The Defendant' Motions to Suppress Statements.

2.    The Defendant's Motion to Suppress Evidence Under Rule 12(b)(3)(C).

A Hearing on the Motions was conducted on May 9, 2005, at which time, the Defendant appeared pro se, and by Standby Counsel Michael C. Davis, Esq., and the

Government appeared by Timothy C. Rank, Assistant United States Attorney.[1]   For

the reasons expressed below, the Defendant's Motions to Suppress Statements are

denied, and his Motion to Suppress Evidence is also denied.

## II.  Factual and Procedural Background

In a three-Count Indictment, the Defendant is charged with one Count of

sexually exploiting a child, in violation of Title 18 U.S.C. §§2251(a), and 2251(d); one

Count of aiding and abetting the mailing of child pornography, in violation of Title 18

U.S.C. §§2252(a)(1), 2252(b)(1), and (2); and one Count of possession of child

pornography, in violation of Title 18 U.S.C. §§2252(a)(4), and 2252(b)(2).  The events

which gave rise to those charges are said to have occurred within this State and

---

[1]At the outset of the Hearing, the Defendant expressed his desire to waive his appearance before the Court.  We advised the Defendant that the Sixth Amendment provided him with an absolute right to cross-examine witnesses who might be called to testify at the Hearing, and that, in waiving his appearance, he would effectively be abandoning that right, and would deprive the Court of hearing further, from him, as to the Motions he has filed.  We counseled against such a waiver, but the Defendant persisted in his desire to waive his right to be present at the Hearing.  Accordingly, after inquiring into whether the waiver was motivated by threats, promises, or other improper purpose, we concluded, on the basis of the Defendant's responses, that his waiver was voluntary, and we allowed the Defendant, who is in the custody of the United States Marshals, to be escorted from the Courtroom.

District, in or about April of 2001.  As pertinent to the charges, and to the Motions

now before us, the operative facts may be briefly summarized.[2]

The Defendant has a past history of unlawful sexual conduct, including two

convictions, in 1985, for criminal sexual conduct in the third degree, and one

conviction, for the same offense, in 1990.  Subsequently, in 1995, the Defendant was

civilly committed, as a "sexually dangerous person," under Minnesota Statutes Section

253B.18, Subdivision 1.[3]   See In re Dennis Eugene Mentzos, 1996 WL 81721

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here
factual issues are involved in determining a motion, the court shall state its essential
findings on the record."  As augmented by our recitation of factual findings in our
"Discussion," the essential factual findings, that are required by the Recommendations
we make, are contained in this segment of our Opinion.  Of course, these factual
findings are preliminary in nature, are confined solely to the Motions before the Court,
and are subject to such future modification as the subsequent development of the facts
and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir.
1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

[3]"A sexually dangerous person is defined as a person who:  (1) engaged in
a course of harmful sexual conduct; (2) manifests a sexual, personality, or other mental
disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual
conduct."  In re Dennis Eugene Mentzos, 1996 WL 81721 at *3 (Minn.App., February
27, 1996), quoting Minnesota Statutes Section 253B.02, Subdivision 18b.  As
observed by the Minnesota Court of Appeals, "[h]is modus operandi is consistent,
frequenting places where young women will be present, inviting them to his house,
coercing them into sexual acts, and, if refused, using threats or violence."  Id. at *4.
His victims frequently included minor children, and his current Federal charges are said
(continued...)

- 3 -

(Minn.App., February 27, 1996)(detailing the extensive sexual crimes, which were committed by the Defendant, so as to justify his civil commitment); see also, State v. Mentzos, 1994 WL 425172 (Minn. App., August 16, 1994)(detailing the Defendant's conviction for making terroristic threats against a woman who had rejected his advances), rev. denied (Minn., September 16, 1994).   At the time that the criminal conduct, which is alleged in his Indictment, is said to have been committed, the Defendant was confined at the Minnesota Sexual Psychopathic Personality Treatment Program ("Treatment Program"), which is located in Moose Lake, Minnesota.   The Treatment Program is a secured hospital, with a maximum security fence, and locked doors.   The grounds of the Treatment Program are adjacent to, but separate from, the Moose Lake Minnesota Correctional Facility.

On January 30, 2002, Dale Heaton ("Heaton"), who is the Chief of Police for the Moose Lake Police Department, was contacted by a Detective Starkey, from the San Jose Police Department in San Jose, California, and was asked to retrieve items that had been seized during the execution of a Search Warrant for the Defendant's living quarters at the Treatment Program.   He was also asked to conduct an interview

_____

[3](...continued)
to involve a child victim.

- 4 -

of the Defendant as part of an investigation into the events, which ultimately resulted in the pending charges.  At that time, Heaton was aware that the Defendant was the focus of the investigation being carried out by the San Jose Police Department.

On January 31, 2002, Heaton met with Rich Harry, who is the Chief Executive Officer of the Treatment Program, and asked to conduct an interview of the Defendant.  Heaton then instructed an officer with the Treatment Program to ask the Defendant if he would be willing to answer questions and, if so, to escort the Defendant to the visitor's center, where the interview would be conducted.  Heaton described the visitor's center as a large, secured room, with several tables and chairs. When the Defendant was escorted to the visitor's center by a single Treatment Program staff member,  Heaton was seated at a table near the center of the room. Heaton was wearing his police officer's uniform, but was unarmed.

The Defendant and Heaton shook hands, and Heaton asked the Defendant to sit down at the table.  Heaton then introduced himself, informed the Defendant that he was doing follow up work for the authorities in San Jose, California, and that the interview would be tape recorded.  Without advising the Defendant of his Miranda rights, Heaton activated the tape recorder, and began the interview.

- 5 -

Shortly after the interview began, the Defendant stated his desire not to do anything incriminating, at which point, Heaton advised, "I should say here, you are not under arrest obviously for anything and you are free to get up and leave the room at any time you want."  Government's Exh. 1, at p. 2.  The Defendant did not terminate the interview, but continued to answer Heaton's questions.  Heaton further testified that the Defendant was not restrained in any way, nor was his statement taken by threat or coercion.  Heaton described the Defendant as exhibiting a friendly demeanor throughout the interview, despite the evasiveness of his responses, and he did not appear to be intoxicated.  The Defendant never requested the assistance of an attorney and, aside from one question that the Defendant did not want to answer, he never made statements which would suggest a desire to invoke his right to silence.  The interview lasted approximately fourteen minutes, and concluded when Heaton did not have any more questions to ask.  At the conclusion of the interview, the Defendant was asked if there was anything that he would like to add, to which he responded, "No, it was good to see you, man, they thought I wasn't going to come talk to you, but I was like, cool, the Chief wants to see me."  Id. at p. 8.

After Heaton had deactivated the tape recorder, the Defendant made the comment:  "She's not Hispanic, she's Filipino."  Heaton interpreted this statement as

a reference to a picture of the alleged victim in this case, that was discovered in the Defendant's living quarters, whose depiction Heaton had earlier referred to, in the course of the interview, as a "young Hispanic girl." Id. at p. 6. The Defendant was not arrested after the interview, but was returned to the Treatment Program staff person, who had not participated in the interview, but who had waited by the door of the visitor's center. The Defendant was then escorted back to the main Treatment Center facilities.

### III.  Discussion

### A.  The Defendant's Motions to Suppress Statements.

1.  Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984). Once a suspect is in police custody, and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal

counsel during questioning.  See, Miranda v. Arizona, supra at 473; see also, Dormire v. Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  Stansbury v. California, supra at 322, quoting California v. Beheler, 463 U.S. 1121, 1125 (1983).  A list of common indicia of custody identified by our Court of Appeals includes:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir 1990); see United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, --- S.Ct. ---, 2005 WL 40906, 73 U.S.L.W. 3401 (U.S., May 31, 2005); United States v. Axsom, 289 F.3d 496, 500, 501 (8th Cir. 2002).

- 8 -

However, those factors "are not by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827. Instead the Griffin factors serve as a guide to the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." See, United States v. Czichray, supra at 827.

        2.   Legal Analysis. At the time that he was interviewed, the Defendant was a civilly committed client in the Treatment Program. The Treatment Program facility contains many of the same restrictive features of a correctional facility, such as locked doors, and a maximum security fence. While, for purposes of this analysis, the Defendant's civil commitment is tantamount to incarceration, "the mere fact of incarceration does not ipso facto render an interrogation custodial." United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998), citing Leviston v. Black, 843 F.2d 302, 304 (8th Cir. 1988). Rather, such a commitment must be considered in the determination of "whether a reasonable man in the suspect's position would have understood himself to be in custody." Id. This determination "requires close consideration both of how [the defendant] got to the interview room, and the

atmosphere of the interview[] once [the defendant] arrived for, and during questioning." Id., at 503.

Our determination of whether the Defendant was "in custody" is guided by our Court of Appeals' decisions in Chamberlain and Leviston. In Chamberlain, the Court applied the Griffin factors and found that, under the totality of the circumstances, the incarcerated defendant was "in custody" for Miranda purposes, at the times that he was interviewed by officers from the Minnesota Department of Corrections ("DOC"). The circumstances identified by the Court to support that determination included a finding that the interviews were conducted in a secured area, where the defendant could not have entered on his own; that the defendant was "summoned" to the interview room; and that he was escorted to the interview room by either an investigator or a prison guard. Id. The Court also noted that the defendant was never informed that he was free to leave, and that, if he had chosen to leave the interview room, he would have violated prison rules, and would have risked the consequences of such violations. Id., at 504.

In addition to the circumstances under which the defendant was brought to the interview, the Court also noted the "police dominated" atmosphere surrounding the interview. Specifically, the Court noted that the interviews were conducted by

investigators from the DOC, and that, as a result of the investigation, the defendant was transferred from the medium security facility to a closed custody facility, and then to a segregation unit, following the second interview.  Id.

In contrast, the Court in Leviston concluded that the defendant had not been in custody, at the time that he was interviewed by a police officer.  Leviston v. Black, supra at 304.  The facts supporting the Court's conclusion, in Leviston, included the defendant's expressed desire to conduct the interviews, his voluntary entry into the interview room, his freedom to leave the interview room at any time, and the fact that, while the door to the interview room was locked from the outside, the defendant was allowed to leave upon his own request.  Id.  The Court also noted that the interview was relatively brief, lasting approximately thirty (30) minutes, and that there were no "strong arm" tactics employed during the conduct of the interview.

Guided by these decisions, as well as in the application of the Griffin factors, we conclude that, under the totality of the circumstances, the Defendant was not "in custody" at the time that he was interviewed by Heaton.  While the Defendant was escorted to the visitors' center by a Treatment Program staff person, the uncontradicted Record shows that he was not directed to submit to the interview, but had agreed to the interview on his own accord, without any coercive pressures being

placed upon him so as to force an interview.  The interview was conducted by a single officer -- Heaton -- who was in uniform, but unarmed, and the Defendant was expressly advised that he was not under arrest, and that he was free to leave the interview at any time.  The Defendant was not subjected to threats, nor is there anything on the Record to suggest that Heaton used "strong arm" tactics to elicit any information from the Defendant.  Under such circumstances, a reasonable person could not have believed that he was "in custody" for the crimes being investigated. See, United States v. Menzer, 29 F.3d 1223, 1232 (7th Cir. 1994)(finding that an inmate was not in custody where he voluntarily appeared at the interview, he was not restrained in any manner, the door to the interview room was unlocked, and he was told by the interviewee that he was free to leave).   Therefore, we recommend that the Defendant's Motion to Suppress Statements be denied.

B.      The Defendant's Motion to Suppress Evidence Under Rule 12(b)(3)(C).

On the face of the Motion, the Defendant requests that the Court Suppress evidence, which he asserts was transported from California, to Minnesota, on or around December of 2000.  The Defendant contends that such evidence is somehow tainted by the pretrial publicity in this case and, to allow its admission, would constitute a violation of his rights under the Fourth, Sixth, and Fourteenth

Amendments.   However, the Defendant has failed to identify any Governmental misconduct in the discovery, and collection of this evidence, and any prejudice that might result from jurors having previously been exposed to the evidence, which will be presented in this case, can certainly be abated by Jury questionnaires, and <u>voir</u> <u>dire</u>. Accordingly, on the grounds asserted, the Defendant's Motion fails.

At the Hearing on the Defendant's Motions, the Government expressed its intention to offer evidence at Trial, which was discovered during the execution of a Search Warrant at the Sherburne County Jail on May 23, 2004.   While the Defendant has filed numerous Motions, which pend before the Court, it does not appear that he filed a Motion to Suppress evidence discovered during the execution of that Search Warrant.   Nevertheless, in the event that any of the Defendant's Motions, and specifically this Motion, liberally construed, were intended to challenge the admissibility of the items seized during the warranted search at the Sherburne County Jail, we will briefly address the sufficiency of the pertinent Search Warrant, on its four corners.

1.      <u>Standard of Review</u>.   In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable

cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband. <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996). In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place. <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993). For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, supra at 695.

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th

Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir.

2001), cert. denied, 534 U.S. 1084 (2002).  Moreover, the reviewing Court must not

engage in a <u>de</u> <u>novo</u> review but, rather, should accord great deference to the decision

of the Judicial Officer who issued the Warrant.  <u>United States v. Maxim</u>, 55 F.3d 394,

397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); <u>United States v. Curry</u>, 911

F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated

deference to the determination of the issuing Judicial Officer is consistent with the

Fourth Amendment's sound preference for searches that are conducted pursuant to

Warrants.  <u>Illinois v. Gates</u>, supra at 236.

      2.   <u>Legal Analysis</u>.  A search of the Defendant's jail cell, his outgoing

mail, and his administrative complaints, was conducted on May 23, 2004, pursuant to

a Search Warrant, which had been issued by a United States Magistrate Judge, in this

District, on May 20, 2004.  See <u>Docket No. 22</u>.  Attached to the Application for the

Search Warrant was an Affidavit, submitted by Paul Gustafson ("Gustafson"), who

is a Special Agent for the United States Secret Service.  See <u>Docket No. 21</u>.

Gustafson averred that the Defendant had been indicted on the pending charges, and

that, during the course of their investigation, the alleged victim had provided law

enforcement personnel with handwritten letters which, she represented, had been

received from the perpetrator of the alleged acts.  Gustafson noted that one of those letters contained the fingerprints of the Defendant, and that it was believed that a handwriting exemplar would provide evidence that the Defendant engaged in the alleged criminal activity.  Gustafson was also informed that the Defendant had refused requests, by law enforcement personnel, to provide a handwriting exemplar, and he had defied both a Grand Jury Subpoena, and two Court Orders, directing him to provide such a handwriting sample.

Gustafson went on to describe the mail screening process for detainees at the Sherburne County Jail, as well as the representations of jail staff that, through this process, they had reviewed several handwritten letters, which had been sent by the Defendant.  Gustafson also averred that jail staff had advised that they had observed several handwritten documents in the Defendant's cell, during routine contraband searches, and that certain administrative grievances, which had been filed by the Defendant, were also handwritten.  Gustafson averred that he had arranged for jail staff to contact him when the Defendant submitted any outgoing, non-privileged mail, and he proposed that the search be conducted at that time, provided that the Search Warrant had not become stale.

- 16 -

Giving proper deference to the issuing Judicial Officer, the Search Warrant was plainly supported by probable cause that the search would yield documents containing the Defendant's handwriting, which was likely to constitute evidence of criminal activity.   Notably, the Defendant had been indicted for the alleged offenses, and handwritten notes, which had been addressed to the alleged victim by the perpetrator of the crime, had already been discovered -- one of which contained a finger print matching that of the Defendant.   Further, Gustafson had averred that he had received reliable information, from staff persons at the Sherburne County Jail, that documents containing the Defendant's handwriting could be found there.   Moreover, the Search Warrant was plainly fresh, having been issued only three days before its execution. Further, we find no other fatal error in the Search Warrant or its supporting papers.

Accordingly, having found the Defendant's asserted basis for suppression meritless, and further finding that the Search Warrant, which was executed at the Sherburne County Jail on May 23, 2004, was amply supported by probable cause, and was not otherwise defective, we recommend that the Defendant's Motion to Suppress Evidence under Rule 12(b)(3)(C) be denied.[4]

---

[4]Even if the information in the Search Warrant were insufficient to establish
(continued...)

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Defendant's Motions to Suppress Statements [Docket Nos. 139, 147] be denied.

2.      That the Defendant's Motion to Suppress Evidence under Rule 12(b)(3)(C) [Docket No. 130] be denied.

Dated:   June 9, 2005                    s/Raymond L. Erickson
_____  -                                 Raymond L. Erickson
                                         UNITED STATES MAGISTRATE JUDGE

---

[4](...continued)

probable cause, we would be compelled, by the law of this Circuit, to find that the Agents' reliance upon the Search Warrant was reasonable, because it "was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984).  Accordingly, even if probable cause were lacking, we would still recommend that the Defendant's Motion to Suppress Evidence Under Rule 12(b)(3)(C) be denied.

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 24, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 24, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.